**MIDWESTONE BANK AND TRUST, Plaintiff,**

v.

**COMMERCIAL FEDERAL BANK; Bloomfield Livestock Market, Inc.; Ron Schooley; David Schooley; and Schooley Farms, Defendants.**

No. 4:04–CV–00673–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Oct. 12, 2005.

806

Legrande W. Smith, Mark D. Walz, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Plaintiff.

Lynn W. Hartman, Simmons Perrine Albright Ellwood, Wythe Willey, Wythe Willey Law Office, Cedar Rapids, IA, August

B. Landis, Thomas H. Burke, Whitfield & Eddy, PLC, Des Moines, IA, for Defendants.

## ORDER

GRITZNER, District Judge.

This matter is before the Court on Plaintiff's appeal from the Bankruptcy Court's November 12, 2004, order denying its motion to amend. The issues raised on appeal have been fully briefed by all parties, and the matter is now ready for the Court's review.

## I. SUMMARY OF MATERIAL FACTS AND PROCEDURAL HISTORY

This case stems from cattle financing that went awry. Defendants David and Edna Weiler ("the Weilers") are husband and wife and are in the business of custom feeding cattle in Davis County, Iowa. Defendants Ronald and David Schooley own Bloomfield Livestock Market, Inc. ("BLMI")[1]. BLMI is a livestock auction business that sells cattle on a commission basis. BLMI also backgrounded[2] cattle and fed cattle to market weight. As part of the backgrounding process, BLMI would purchase cattle and place them at various feedlots for feeding, including the feedlot owned and operated by the Weilers.

The Bankruptcy Court found that as early as 1988 or 1989, BLMI and David Weiler entered into business relations for the purposes of custom feeding BLMI's cattle. The only written agreement entered into between BLMI and the Weilers was dated August 1, 1996.[3] Pursuant to the terms of the 1996 agreement, BLMI would place its cattle on the Weilers' feedlot to be fattened. The Weilers were responsible for the medical needs of the cattle, including vaccination and medicine, and BLMI would be responsible for any death loss. The Weilers would be paid based on the amount of weight gained by each animal and would receive a portion of the net profit once the cattle were sold. The 1996 cattle were eventually sold.

In 1997, the Weilers purchased their own cattle with financing provided by Plaintiff MidWestOne Bank[4] ("MSB"), a lending institution with offices located in Oskaloosa, Iowa. These loans were originated by MSB loan officer David Shelquist ("Shelquist"). On June 23, 1997, the Weilers executed an agricultural security agreement with MSB. This security agreement granted MSB a blanket security interest in the Weilers' assets, including all farm products, crops, and all livestock owned, used, or produced by the Weilers. On July 9, 1997, MSB filed a UCC–1 with the Secretary of the State of Iowa. This form constituted a public filing which indicated MSB possessed a security interest in all farm products, crops, and livestock of the Weilers.

In 1998, the Weilers again custom fed cattle for BLMI. At that point in time,

---

1. Ronald Schooley is President of BLMI, David Schooley is the Vice–President of BLMI.

2. Backgrounding refers to the process of growing, feeding, and managing cattle from weaning until they enter a feedlot and are then placed on a finishing ration. Backgrounding is used to control the weight gain of cattle so that enough muscle and bone are developed before laying down a fat covering and marbling.

3. The agreement was handwritten by one of the parties.

4. Formerly known as Mahaska State Bank ("MSB"); referred to as MSB throughout this order to provide consistency with the underlying record made in the bankruptcy proceedings.

the Weilers' property contained both cattle owned by the Weilers and cattle owned by BLMI. The cattle on the Weiler feedlot wore eartags which identified the owner of the cattle. In 1999, BLMI purchased 960 head of cattle with financing obtained from Defendant Commercial Federal Bank ("CFB") and placed the cattle on the Weilers' feedlot for custom feeding. In 2000, BLMI purchased 1924 head of cattle, again with financing obtained from CFB, and placed the cattle on the Weilers' feedlot for custom feeding. These cattle are hereinafter referred to as the 1999 cattle and 2000 cattle, respectively.

The delivery of the cattle to the Weilers' feedlot was evidenced by a buyer's bill or buyer's invoice. David Schooley testified that on these buyer's bills or invoices, the cattle were identified by the farm that custom fed the cattle.[5] Thus, David Weiler's name was placed on the invoices and bills which recorded the cattle placed on his feedlot.

The feeding arrangement between BLMI and the Weilers for the 1999 and 2000 cattle was an oral agreement by which the Weilers were to care for and feed the cattle. When BLMI sold the cattle, the Weilers were to receive the amount in excess of BLMI's costs for the cattle. The Bankruptcy Court found that this amount was determined as the slaughter sale price, minus the price BLMI paid for the cattle, plus interest, on the purchase money BLMI had borrowed. Pursuant to the terms of the oral agreement, the Weilers were responsible for any death loss of the cattle while they were in their care.

The record shows that over the course of their business relationship, at times BLMI would advance the Weilers money.

This money was taken against sums the Weilers would have received from BLMI once the cattle were sold. At times, the amount of money BLMI advanced to the Weilers would exceed the amount BLMI would have owed to the Weilers after the sale of the cattle. As a result, any outstanding balance of money advanced to the Weilers would be carried forward to the next group of cattle on a debt ledger that was maintained by BLMI. At the end of 2000, the Weilers were carrying forward approximately $140,000.00 of debt from prior years.

The parties stipulated that the 2000 cattle, after they were fattened, were sold to IBP, Inc., and the Weilers' proceeds were applied by BLMI and/or the Schooleys to reduce the indebtedness the Weilers owed BLMI. The 2000 cattle were sold under the name "Schooley Farms". This was done because at the time, IBP did not want to issue checks directly to cattle sale barns.

The Weilers did not purchase cattle in 1999 and 2000; however, the record shows David Weiler indicated to MSB representatives that the cattle on his feedlot in 1999 and 2000 were owned by him. MSB continued to loan the Weilers money during this time period, and by the fall of 2000, MSB's loan commitment to the Weilers exceeded $2,000,000, an amount in excess of MSB's internal lending limit.

In approximately March of 2001, MSB came to realize the Weilers did not own the cattle that were located on their feedlot. MSB claimed to have been relying on the cattle as collateral for its loans to the Weilers.

On March 30, 2001, MSB brought a petition for replevin of personal property in

---

**5.** The cattle are identified in this manner because different feeders have varied reputations regarding how they feed and care for the cattle, and it is important to the purchaser of the finished cattle to know where the cattle were fed.

Davis County, Iowa, seeking, among other things, a determination of the ownership of certain cattle and other personal property in the possession of the Weilers. A hearing on MSB's request for immediate possession of the personal property was scheduled for April 13, 2001. On April 12, 2001, the Weilers filed a voluntary petition for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Iowa.[6] That same day, the Weilers filed a notice of filing chapter 11 bankruptcy in the state court action. The state court action was ultimately stayed pursuant to the automatic stay provision of 11 U.S.C. § 362. On August 23, 2001, MSB filed a complaint in the United States Bankruptcy Court to determine the validity, priority, and extent of liens with regard to the Weilers' property ("the MSB complaint").[7]

On March 14, 2002, the Weilers filed a complaint to avoid transfers of their interest in proceeds from the sale of cattle, naming BLMI, Ron and David Schooley, and Schooley Farms as Defendants.[8] On April 15, 2002, the Official Unsecured Creditors Committee ("OUCC") was appointed by the United States Trustee to serve in relation to the bankruptcy case. On November 8, 2002, the OUCC filed a motion to substitute the OUCC for the Weilers as plaintiffs in adversary proceeding no. 02–20045. On December 4, 2002, the Weilers stipulated to this requested substitution, and on December 5, 2002, the Bankruptcy Court found good cause had been shown for the substitution, and the motion was sustained. On December 17, 2002, the OUCC filed for leave to amend the 02–20045 complaint. On February 24, 2003, the Bankruptcy Court granted the motion for leave to amend the complaint, and on February 26, 2003, the OUCC filed the 02–20045 amended and substituted adversary complaint.

Counts four, five, and six of the MSB complaint were dismissed by the Bankruptcy Court on May 27, 2003. On May 10 through May 14, 2004, a bench trial was held on the merits of the counts that remained in 01–20105 and 02–20045, with the Honorable Russell J. Hill, United States Bankruptcy Judge for the Southern District of Iowa, presiding. At the conclusion of the bench trial, the court took the matter under advisement and allowed the parties time to file post-trial briefs. On November 4, 2004, Judge Hill filed an order addressing the merits of the remaining counts contained in the 01–20105 complaint and the 02–20045 amended complaint.[9] The November 4, 2004, order ruled in favor of BLMI on counts one, two, three, and eight of the MSB complaint, finding that BLMI owned the cattle and MSB's estoppel and "for sale" arguments were inapplicable.[10] The Bankruptcy Court further ordered that CFB, BLMI, and the Schooley Defendants should have judgment against the OUCC, and the amended complaint was dismissed in its entirety.

On November 12, 2004, MSB filed a motion to amend order. MSB asserted in that motion that a number of the findings of fact made by Judge Hill in the November 4, 2004, order were contrary to the record at trial and thus should be amended. That same day, United States Bankruptcy Judge Lee Jackwig denied MSB's

---

6. Case No. 01–01776.

7. Case No. 01–20105.

8. Case No. 02–20045.

9. Judge Hill retired from office the next day.

10. The Bankruptcy Court found in favor of MSB on count VII of the MSB complaint, finding that MSB had a superior security interest in the equipment.

motion to amend via a CM/ECF text order. The text order stated, "the Court hereby denies the motion as amounting to an appeal from the findings of fact and conclusions of law rendered by United States Bankruptcy Judge Russell J. Hill rather than being a matter appropriate for a successor judge to consider under Rule 9028 of the Federal Rules of Bankruptcy Procedure."

On December 1, 2004, MSB filed in this court a notice of appeal from the Bankruptcy Court. On appeal, MSB asserts Judge Jackwig erred by denying the motion to amend without considering the merits of the motion. MSB further asserted Judge Hill's November 4, 2004, order contained numerous factual errors which led to errors in the court's conclusions of law. MSB asserts once these factual errors are resolved, the record will reveal the Bankruptcy Court erred in concluding that (1) BLMI and CFB were not estopped to deny the Weilers possessed rights in the cattle, (2) the cattle were not held "for sale", and (3) that the exception to § 554.2326(3) would have applied.

The OUCC similarly filed a notice of appeal from the Bankruptcy Court on December 1, 2004. The OUCC set forth arguments identical to those contained in MSB's appeal. In addition, the OUCC argued the Bankruptcy Court erred in failing to determine that an alleged offset by BLMI was an avoidable transfer, and in failing to determine BLMI received an avoidable post-petition transfer by causing the Weilers' corn and silage to be fed to the 2000 cattle post-petition.

## II. STANDARD OF REVIEW

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of the witnesses.

 Fed. R. Bankr.P. Rule 8013. "A finding is clearly erroneous when although there is evidence to support it ... the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Kaelin,* 308 F.3d 885, 889 (8th Cir.2002) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)) (quotations omitted); *see also Stalnaker v. DLC, Ltd.,* 376 F.3d 819, 825 (8th Cir.2004) ("To consider a finding of fact clearly erroneous, we must have a definite and firm impression that the lower court made a mistake."). This Court shall review the Bankruptcy Court's legal conclusions de novo and its findings of fact for clear error. *In re Apex Oil Co., Inc.,* 406 F.3d 538, 541 (8th Cir.2005); *In re O'Brien,* 351 F.3d 832, 836 (8th Cir.2003).

 "Although the evidence presented in the record could be susceptible to differing interpretations, we may not hold that the Bankruptcy Court's chosen interpretation is clearly erroneous where there is more than one permissible view of the evidence." *In re Hixon,* 387 F.3d 695, 700 (8th Cir.2004). "When two different interpretations of the record exist, the factfinder's choice between them cannot be clearly erroneous." *In re Southwestern Glass Co., Inc.,* 332 F.3d 513, 517 (8th Cir.2003) (quoting *City of Bessemer City,* 470 U.S. at 574, 105 S.Ct. 1504) (quotations omitted).

## III. APPLICABLE LAW AND DISCUSSION

### A. MidWestOne Bank v. Weiler, et

### al. (4:04–CV–00672) [11]

**1. Did the Bankruptcy Court err in refusing to consider the merits of the motion to amend findings and to alter or amend judgment?**

MSB argues that the Bankruptcy Court erred by refusing to consider the merits of its motion to amend, claiming its post-trial motion to amend did not constitute an appeal, and Rule 63 does not permit a successor judge to refuse to adjudicate post-trial motions based upon a judge's unavailability due to retirement.

BLMI asserts that Judge Jackwig's denial of the motion to amend was the practical course to take, claiming MSB essentially sought an appeal of Judge Hill's decision via its motion to amend. Alternatively, BLMI contends that even if the Bankruptcy Court should have decided the motion to amend on its merits, remand is not appropriate because a review of the record by Judge Jackwig in deciding the merits of the motion is no different than the review this Court is engaging in for purposes of this appeal. BLMI asserts that denying the remand request would allow this matter to proceed more quickly and efficiently to a final resolution for all parties.

CFB claims that in denying the motion to amend, Judge Jackwig did not fail to exercise her discretion in resolving the motion, stating she exercised her discretion by denying the motion. CFB further argues MSB's motion was an obvious attempt at a wholesale revision of the findings of fact and conclusions of law in order to make them more favorable to MSB. CFB maintains Judge Jackwig's order denying the motion to amend should be affirmed.

 MSB's motion to amend findings and to alter or amend judgment was filed pursuant to Fed.R.Civ.P. 52(b).

On a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59. When findings of fact are made in actions tried without a jury, the sufficiency of the evidence supporting the findings may be later questioned whether or not in the district court the party raising the question objected to the findings, moved to amend them, or moved for partial findings.

Fed.R.Civ.P. 52(b). "Rule 52 F.R. Civ. P. applies in adversary proceedings." Fed. R. Bankr.P. 7052. MSB correctly asserts that a motion to amend is not equivalent to an appeal. Where a litigant believes the court's factual findings or conclusions of law are erroneous in any respect, it may, as MSB did here, file a motion to alter or amend the judgment pursuant to Fed. R.Civ.P. 52(b). *Jackson v. United States,* 156 F.3d 230, 234 (1st Cir.1998) (citing Fed.R.Civ.P. 52(b)).

██ The Bankruptcy Court also indicated in the November 12 order that the motion was not a matter appropriate for a successor judge to consider under Rule 9028. Fed. R. Bankr.P. Rule 9028 provides that "Rule 63 F.R. Civ. P. applies in cases under the Code."

If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed

---

**11.** In its own appeal, the OUCC alleges points of error with corresponding arguments identical to those being made by MSB.

without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

Fed.R.Civ.P. Rule 63. After reviewing the substance of MSB's November 12, 2004, motion, it is apparent the motion did not amount to an appeal, as found by Judge Jackwig, but rather was a proper motion to amend pursuant to Fed.R.Civ.P. 52(b). Judge Jackwig failed to comply with Rule 63, made applicable to bankruptcy proceedings by Rule 9028.

By refusing to consider the post-trial motions, the successor judge failed to comply with Rule 63. After all, the original judge could not have refused to consider them. Although district courts enjoy wide discretion to grant or deny post-trial motions, *see Hutchinson v. Stuckey*, 952 F.2d 1418, 1420 (D.C.Cir. 1992), they cannot refuse to exercise that discretion.

*Mergentime Corp. v. Washington Metro. Area Transit Auth.*, 166 F.3d 1257, 1263 (D.C.Cir.1999); *see also Canseco v. United States*, 97 F.3d 1224, 1227 (9th Cir.1996).

▆▆▆ The record, including the promptly filed text order denying the motion to amend, indicates the Bankruptcy Court did not address the merits of the motion. This Court concludes that MSB's motion to amend should have been decided on the merits by the Bankruptcy Judge pursuant to Rule 9028 and Rule 63. In so finding, this Court disagrees more with the process than with the conclusion. MSB asserts this proceeding must be remanded to the Bankruptcy Court to allow the motion to amend to be decided on the merits.

"Where the trial court has erroneously failed to exercise its discretion, we may either remand or, if the record is sufficiently developed, decide the issue ourselves." *Wharf v. Burlington Northern R. Co.*, 60 F.3d 631, 637 (9th Cir.1995); *Mergentime Corp.*, 166 F.3d at 1266–1267 (noting the same but finding the successor judge's failure to consider recalling witnesses before making his own findings left a gap that the appellate court could not fill). The record in this case is fully developed, and there is no need to call further witnesses.[12]

▆▆▆ Rule 52 is essentially designed to create a record upon which the appellate court may obtain the necessary understanding of the issues to be determined. *See, e.g., Clark v. Nix*, 578 F.Supp. 1515, 1516 (S.D.Iowa 1984). Given the current posture of the case, this Court has analyzed the merits of the motion to amend, as well as the entire record and the decision by Judge Hill. In the interests of efficiency and judicial economy, the Court declines to remand this action to the already overburdened Bankruptcy Court and instead considers the merits of MSB's original motion to amend. As more fully discussed below, the Court finds the motion to be a broad effort to reshape the findings of the Bankruptcy Court, creating findings more favorable to MSB, rather than more accurate, for purposes of appellate review. Rule 52(b) is not to be used to obtain a rehearing on the merits nor to relitigate old questions, *see, e.g., Gutierrez v. Ashcroft*, 289 F.Supp.2d 555, 561 (D.N.J. 2003), and such a motion may not be used to raise arguments which could have been made in advance of the prior court's ruling. *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1397 (8th Cir.1996).

**12.** Witness credibility issues are not central to the claims now asserted.

This Court finds that had the Bankruptcy Court considered the motion to amend on its merits, the result would have been the same; it should have been denied as an unsuccessful motion under Rule 52(b), leaving the parties to an appeal from the findings made by Judge Hill. The matter is now before this Court seeking a remand to the Bankruptcy Court for consideration of the motion to amend, and in the alternative an appeal of Judge Hill's ruling. Accordingly, having found the motion to amend should have been denied on its merits, the Court proceeds with this case as an appeal of Judge Hill's order.

## 2. Did the Bankruptcy Court err in making certain findings of fact?

MSB argues a number of the findings of fact made by the Bankruptcy Court in its November 4, 2004, order were contrary to the record at trial and therefore should be amended. MSB contends that the following findings of fact must be amended: [13]

### a. The Court found:

*MSB's loan policy required proper identification by sex, weight, brand, and location of animals for purchase money livestock loans. This provision was not enforced until November 2000 at which time MSB required Debtors to produce invoices for further cattle notes and advances.*

(November 4, 2004, Order at paragraph 37.) MSB asserts this finding is contrary to the evidence, claiming Shelquist did receive and place in the Weilers' loan file the invoices issued by BLMI to Weiler, which contained the cattle sex, weight, brand, and location information. MSB overstates the quality of Shelquist's trial testimony.

Q: And you testified that you didn't, during the course of this loan, have all of the invoices. Do you know one way or the other whether you had all of the invoices for the first loans you made in 1997?

A: I can't recall on that, no.

Q: You don't have any idea one way or the other?

A: No, I don't.

Q: Is it possible you did have all of the invoices that year?

A: We may have, yes.

Q: Would those invoices still be in the loan file?

A: It's very possible they wouldn't be. The practice we tried to follow—or I followed on some of mine was the boarding data was a computer-prepared form of the note along with the invoices, and a copy of the note would be put in the credit file. When that note was paid in full, it was removed and discarded.

(Trial Transcript, Vol. V, p. 1020, l. 9 to p. 1021, l. 3.) In fact, Shelquist consistently testified, both in his deposition and his trial testimony, that while he *may* have received invoices for *some* of the cattle, he never was provided with invoices which equaled the number of cattle the Weilers financed, and he did not obtain an invoice for every animal Weiler purchased.[14]

---

**13.** In response to this contention, CFB generally asserted that there is record evidence to support each of the Bankruptcy Court's challenged findings of fact.

**14.** Shelquist's deposition was taken on May 17, 2002. By the time trial in this matter took place, Shelquist was experiencing health problems which he testified were causing problems with his memory. Shelquist's deposition testimony, a full copy of which was admitted into evidence during the bench trial of this matter, was relied upon heavily during his trial testimony and provides a more detailed source for his recollection of the relevant events pertaining to this litigation.

 MSB's written loan policy specifically states, "Property documentation of [purchase price livestock loans] is unique and should include ... proper identification by sex, weight, brand and location of animals." MSB *possibly* obtaining *some* of the invoices for the cattle does not constitute full enforcement of the loan provision. The record evidence supports Judge Hill's finding.

**b. The Court found:**

*All of the proceeds [of the 1999 cattle] went to BLMI.*

MSB contends this is contrary to the evidence, asserting the parties stipulated that $521,749.31 of the proceeds from the sale of the 1999 cattle were deposited in the Weilers' account at MSB. In support of this assertion, MSB cites to its own post-trial brief, which recites paragraph 48 from the stipulated final pretrial order. This paragraph merely indicates that $521,749.31 was deposited at MSB. A stipulation regarding where the funds were deposited is not dispositive on the issue of who ultimately obtained the benefit of the proceeds from the 1999 cattle. MSB also cites to its post-trial brief, page 19 D.3, which states,

BLMI allowed Weiler to sell cattle in his name through the summer of 2000 (including $521,000 worth of cattle through May/June 2000) thereby giving further appearance that he was the owner of the cattle.

To support **this** paragraph, MSB cites to the trial testimony of MSB loan officer Larry Anderson as follows:

Q: Dave Shelquist—let's just come back to my question. What did you know about where Dave Weiler sold cattle in late spring, summer of 2000? You had to have some curiosity, I'd assume, since that money would be money, if you had a security interest in those cattle, which would repay the bank loans.

A: The only knowledge I would have had had to deal with the '99 cattle that were sold early 2000 because he was replacing come April of 2000. There was his purchase price feeder cattle to where he was filling up his lot come spring of 2000 on, so there was no repayment that even made sense since April of 2000 to Mahaska State Bank.

(Anderson Trial Testimony, Trial Transcript Vol. II, p. 372, ll. 5–18.) This testimony does not express, or even imply, that "BLMI allowed Weiler to sell cattle in his name through the summer of 2000". The testimony merely indicates that Anderson would have only had knowledge about where Weiler sold the 1999 cattle in 2000. In any event, the cited testimony certainly does not establish that the proceeds from the sale of all of the 1999 cattle went to anyone other than BLMI. MSB has failed to demonstrate this finding of fact is clearly erroneous.

**c. The Court found:**

*During these visits [during 2000 by MSB] the representatives never inquired of Debtors if they were custom feeding livestock for anyone.*

 MSB argues this finding is contrary to the evidence. The finding in its entirety reads,

Representatives of MSB inspected the cattle located on Debtors' feedlot in 2000 on two occasions. During these inspections, numbers of cattle were approximated; David Weiler represented that he owned the cattle. The MSB representatives did not note, examine, or inquire about ear tags in the cattle. During these visits the representatives never inquired of Debtors if they were custom feeding livestock for anyone.

BLMI asserts that by failing to examine the ear tags that were located on the cattle, MSB did not do what a prudent lender would have done. CFB maintains that it was no secret that the Weilers engaged in the custom feeding of cattle, as David Weiler openly distributed business cards identifying his business as "Iowa Custom Feeding".

MSB claims that on each occasion in 2000, Anderson asked David Weiler, or his family, whether anyone else had an interest in their cattle. MSB argues the Weilers affirmed that no one else held any interest in the cattle. The deposition testimony of Shelquist to which MSB cites is as follows:

A: I had asked Weiler on different occasions when I was on the farm and in my office if those were all his cattle on feed. And he indicated to me that they were.

MSB then cites to the following trial testimony of John Pothoven, Chairman and President of MSB:

Q: Okay. Do you recall ever having any discussion with Mr. Weiler on the subject of whether anyone else had an interest in his cattle?

A: Yes.

Q: Describe that for me.

A: That was the last time that Larry and I were there—or the only time Larry and I were there, and the lots were all full. I asked him, "Are these all your cattle?" And his answer was "Yes."

Q: Had you ever asked that question prior to that date?

A: It's a common question we ask periodically.

Q: So on those other two visits, do you have memory, yes or no, of—

A: The second visit I did not. I can't say about the first.

Q: And David Weiler's response when you asked him that question?

A: They were his.

(Trial Transcript, Vol. III, p. 549, ll. 2–21.) Finally, MSB cites to the trial testimony of Anderson as follows:

Q: Mr. Anderson, did you ever inquire of anyone other than Walter Weiler as to the ownership of the cattle that were on the premises?

A: I asked David Weiler via phone on March 19th, because of a rumor another officer heard, whether he owned the cattle or not, and he said he owned the cattle. That was via phone on March 19th of 2001....

(Trial Transcript, Vol. II, p. 288, l. 21 to p. 289, l. 3.) All of this testimony cited by MSB pertains to *ownership* of the cattle, not whether the Weilers were *custom feeding cattle for others*. MSB has failed to cite to any portion of the record which shows that at any time a MSB representative specifically asked the Weilers if they were custom feeding livestock for other persons. While David Weiler's representation in 2000 that all of the cattle belonged to him would seem to preclude the necessity of asking him at that time if he was custom feeding those same cattle for another entity, the fact remains that MSB never inquired along these lines prior to 2000, apparently never conducted a thorough investigation into the Weiler operation, and did not require proper documentation on the livestock pursuant to its own internal policy. Judge Hill's finding that during the visits in 2000 the MSB representatives never asked the Weilers if they were custom feeding for anyone has support in the record, and the Court concludes the finding is not clearly erroneous.

**d. The Court found:**

*[C]attle owners provide bills of sale to feedlot operators for information purposes only ...*

MSB contends BLMI's expert, James Willrett[15], testified he had never had occasion to make out cattle sale invoices to a party that did not have interest in the cattle, and that he had never before seen an arrangement such as that between BLMI and the Weilers, describing the arrangement as "atypical". BLMI contends that any error in the Court's finding here is irrelevant because MSB did not rely on the invoices in making its loans to the Debtors.

█ Ron Schooley testified that when BLMI purchased cattle and then placed the cattle on different farms for feeding, BLMI would put the name of the feeder farm on the bill of sale so that his brother, David Schooley, could keep the records straight regarding what cattle were located where. David Schooley testified that cattle are identified by the farm they come from, i.e., the farm that custom fed the cattle. Given this method of identifying cattle, David Schooley testified if BLMI purchased cattle and placed it with a feeder such as David Weiler, Weiler's name would have appeared on the invoice. The Bankruptcy Court found both Ron and David Schooley to be credible witnesses, finding Ron Schooley in particular to be candid to the point of bluntness. The court therefore gave much weight to their testimony, and on review this Court should not engage in a credibility analysis.

There is sufficient evidence in the record to support the conclusion that BLMI provided Weiler with bills of sale for informa-

tion purposes only, and the Court concludes this finding is not clearly erroneous.

**e. Regarding the buyer bills and buyer invoices BLMI used to identify the destinations where the livestock were to be placed, the Court found:**

*[S]ince MSB could not show that it ever required or received these documents from Debtors, the court cannot find that it was misled or relied upon the documents to its detriment.*

█ MSB simply asserts that this finding is contrary to the evidence. BLMI contends that the record supports the finding that MSB did not require the Weilers to produce invoices before loaning them money for the 2000 cattle, and that MSB has made no attempt to demonstrate the loans it provided to the Weilers corresponded with the purchase of cattle.

In the November 4, 2004, order, the Court found,

Finally, MSB did not follow its own internal procedures for making loans, and tracking the collateral. MSB offered no evidence at trial of the purchase of cattle, identification of cattle in which they claimed a security interest, sale of those cattle, and the disposition of the sale proceeds. The court acknowledges that BLMI's method of tracking the cattle could be misleading to a creditor, because it used its buyer bills and buyer invoices forms to identify the destination where the livestock were to be placed. Although the court believes Ronald and David Schooley's testimony that they did not intend to deceive anyone, this method could give the impression that the named farmer or feedlot operator had

**15.** The Bankruptcy Court found Willrett had extensive knowledge of the livestock industry in general and custom cattle feeding in particular. The Bankruptcy Court further found Willrett's opinion had a reliable basis in knowledge and experience in the discipline, and that his testimony was helpful in understanding the customs and norms in the custom cattle feeding industry.

purchased the livestock. However, *since MSB could not show that it ever required or received these documents from Debtors, the court cannot find that it was misled or relied upon the documents to its detriment.*

(Emphasis added.) As discussed above, despite its written loan policy, MSB has failed to establish that it adhered to this policy by requiring the invoices from the Weilers. Shelquist testified that he knew Weiler bought some cattle through BLMI; however, upon direct questioning, Shelquist testified as follows:

Q: Did you ever see an invoice from Schooleys to Weiler?

A: I can't recall any specific invoice.

Q: Okay. And when I say Schooleys, either the Schooley brothers or the Bloomfield Livestock.

A: I can't recall anything specific, no.

Q: As you sit here today, do you know if you did nor not?

A: I'm sure I have, yes, but I can't recall anything. And I don't want to say that I have if I—I can't recall.

Q: Just so I got this, Dave, you can't recall ever seeing one, right?

A: Right.

Q: Okay. As you sit here today, you don't recall ever seeing an invoice that was brought to you by David Weiler from the Schooley barns?

A: Not specifically, no.

Q: Okay. But are you going to come into court and testify for that bank that you saw invoices from Schooleys?

A: If I can't recall today, I don't think I'll be able to recall it later.

(Shelquist dep. p. 32, 1. 14 to p. 33, 1. 11.) The record fails to establish MSB ever received the invoices for any of the cattle. MSB can not contend it relied on or was misled by documents that it cannot prove it ever received. There is evidence in the record to support Judge Hill's finding, and the Court concludes the finding is not clearly erroneous.

**f. The Court found:**

*The cattle were not delivered for sale.*

MSB argues this finding is contrary to governing law and contrary to the record which MSB claims demonstrated that $521,749.31 of the 1999 cattle were sold by David Weiler. For the reasons discussed below in Section III.A.5 of this order, the Court concludes the record supports the Bankruptcy Court's finding that the 1999 and 2000 cattle were not delivered to the Weilers for sale.

**g. The Court found:**

*MSB knew that Debtors were engaged in the business of custom feeding cattle at their farm near Bloomfield, Iowa.*

MSB asserts the relevant time period is from the summer of 1997 until the Weilers' bankruptcy filing in April 2001, and that during this period of time, MSB had no knowledge, nor reason to know, that the Weilers were custom feeding cattle. BLMI argues that by not verifying that the Weilers were not custom feeding BLMI's cattle, MSB failed to act as a reasonable lender.

■■■ Shelquist testified he knew in 1997 Weiler was custom feeding cattle for BLMI. Shelquist stated the indication he obtained from Weiler was that Weiler was going to terminate the custom feeding relationship with BLMI once Weiler started financing his own cattle. Other than rely on Weiler's alleged indication that he intended to discontinue custom feeding for BLMI, neither Shelquist nor any other MSB representative took any further action to confirm Weiler had ever actually discontinued custom feeding for BLMI.

In fact, upon receiving a "red-flag" in the form of a check in the amount of $101,781 from BLMI payable to Weiler in March of 1999, no investigation was undertaken by Shelquist to determine what these funds represented, despite his knowledge that in the past Weiler had been engaged in custom feeding for BLMI, and despite the fact that Weiler never produced documentation showing this custom feeding relationship had ever ceased. Shelquist testified that based on the business notes he made at the time, he had assumed Weiler had sold cattle to BLMI and the $101,781 check represented the proceeds from the sale.

MSB stipulated that David Weiler distributed business cards identifying his business as "Iowa Custom Feeding". Although MSB denies any knowledge of the business cards, Shelquist testified that Weiler's custom feeding card was located in the MSB loan file, that the card was given to him by David Weiler in 1997, and that he knew when Weiler first came to MSB he was custom feeding cattle for other people.

The record supports a finding that MSB was aware a custom feeding relationship existed in 1997, and MSB did nothing to confirm that relationship ever ceased. The Court cannot conclude Judge Hill's factual finding on this issue is clearly erroneous.

### 3. Did the Bankruptcy Court err in failing to make findings of certain material facts?

Next, MSB contends that a number of facts were proven, but not set forth in the Court's findings in the November 4, 2004, order, arguing that the Bankruptcy Court failed to make findings from uncontrovert-ed evidence in the trial record that are essential to the analysis of the legal issues presented. MSB asserts that the following additional facts should have been found:

a. The Weiler arrangement with BLMI for the 1999 cattle and 2000 cattle was atypical.

b. BLMI carried on a debt ledger the amount it was to be paid from the sale of the 1999 cattle and the 2000 cattle.[16]

c. BLMI's lender, Commercial Federal Bank, had knowledge that MSB was financing the Weilers' cattle in 1998–2000.

d. CFB failed to put two and two together when deciding to finance the Weilers for BLMI when it knew Mahaska was already lending against those.

e. CFB admitted it would have been a good lending practice to notify MSB before it lent against property placed in MSB's borrower's farm.

f. BLMI knew, or should have known, MSB or some other lender was financing the Weilers' cattle in 1997–1998.

g. Mr. Weiler bought groups of cattle totaling 1470 head for over one million dollars using four purchase money cattle loans from MidWestOne in June and August 1997.

h. BLMI setoff from the amounts otherwise payable to the Weilers for the 2000 cattle $335,661.85.

i. CFB did not file a UCC–1 financing statement against the farmer in possession; insist that its borrower file such a financing statement; take a

---

**16.** As BLMI points out, the Court *did* make this finding. "BMLI [sic] maintained a ledger regarding the indebtedness owed with re-spect to the 1999 and 2000 Cattle." (November 4, 2004, Order, p. 8, para. 32.)

lien search on the farmer where the cattle were located; or communicate with the lender to such farmers.

j. MidWestOne's loan officer, Mr. Shelquist, had no knowledge that BLMI or CFB had an interest in the cattle at Weilers after MSB began financing Mr. Weiler in 1997.

k. All the while MSB was providing financing, MSB believed it was the only party financing the cattle at the Weilers.

l. MSB did not know of the double financing by BLMI.

m. Weiler told MSB that he was dissatisfied with his custom feeding arrangement with BLMI and would no longer be feeding for them.

n. BLMI did not use ear tagging of the cattle it was financing that would alert anyone other than Mr. Weiler or Mr. Ron Schooley that BLMI has an interest in those cattle.

o. David Weiler selected many of the cattle purchased at the BLMI auction. When Weiler was present at the BLMI auction, he made the ultimate decision regarding whether to purchase cattle or not.

p. Unless absent from his farm, David Weiler always participated in the sorting and loading of the cattle for sale at IBP.

q. David Weiler had input with respect to the timing of sale of the 1999 and 2000 cattle.

r. Weiler was responsible for all expenses related to care, feeding, and veterinary services for the cattle. The entire risk of profit or loss on the cattle was borne by Weiler.

s. BLMI does not show that its "control" over the cattle in which it admittedly had no interest was any different that then "control" it alleg-

es it exercised over the cattle it did finance.

t. The following amount of indebtedness evidence by the MSB Proof of Claim and the confirmed Amended Plan of Reorganization remained unsatisfied at the time of trial: $2,696,166.37.

 MSB contends that the amendment of the November 4, 2004, order to correct the allegedly incorrect findings, and to make necessary, additional factual findings, will have a material impact on the consideration of the legal error MSB claims was committed by the bankruptcy court.

Defendants move for amended and supplemental findings pursuant to Fed. R.Civ.P. 52(b). They request 78 specific amendments. In issuing its findings and conclusions the court undertook a careful evaluation of the trial testimony and other evidence. *The court need not make findings on all disputed facts. Rather, the findings should provide a reviewing court a clear understanding of the basis for the trial court's decision and the grounds on which it was reached. See, e.g., Cross v. Pasley,* 267 F.2d 824, 826 (8th Cir.1959); *see generally* 9 Wright & Miller, Federal Practice and Procedure: Civil § 2579. The finding and conclusions are very thorough and more than adequate in that regard. Defendants' proposed amendments and supplements attempt a wholesale revision of the findings and conclusions to make them more favorable to defendants. That is not a proper basis for a Rule 52 motion.

*DeGidio v. Pung,* 125 F.R.D. 503, 505 (D.Minn.1989) (emphasis added). The Court concludes the findings made by Judge Hill are adequate to provide a reviewing court a clear understanding of the

basis of the Bankruptcy Court's decision, and additional findings are not necessary.

### 4. Did the Bankruptcy Court err in concluding that Defendants were not estopped to deny the Weilers' rights in the cattle?

MSB argues that BLMI should be estopped from claiming ownership of the cattle in question.[17] BLMI asserts that the *Shaull* case on which MSB relies for support is not controlling and the Bankruptcy Court correctly applied longstanding estoppel principles to MSB's claim. CFB concurs that *Shaull* is readily distinguishable and not controlling with respect to this case.

In addition, both BLMI and CFB point out that MSB never pled an estoppel theory nor was it contained in the final pretrial order, asserting the estoppel argument was first advanced in a late-filed trial brief, submitted to the Bankruptcy Court on the first day of the trial.

▆▆▆ The record demonstrates CFB specifically objected to the injection of the estoppel theory at trial, and that the theory was not addressed in the parties' stipulated final pretrial order.

> [The] pre-trial order "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." Fed.R.Civ.P. 16(e). Consequently, "a party may not offer evidence or advance theories which violate the terms of a pre-trial order." *Glismann*

v. *AT & T Technologies*, 827 F.2d 262, 267 (8th Cir.1987); *see also Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1335 (8th Cir.1985).

*In re Control Data Corp. Securities Litigation*, 933 F.2d 616, 621 (8th Cir.1991). MSB will not be allowed to argue an estoppel theory on appeal.

▆▆▆ Even if the Court were to conclude MSB was entitled to advance its estoppel theory, such a claim of estoppel by MSB would fail on the merits. To establish an estoppel claim, MSB must prove (1) a false representation by BLMI; (2) the false representation was made with the intent to induce MSB to act on that representation; (3) the MSB's lack of knowledge or inability to obtain the true facts; and (4) reliance on the misrepresentation by MSB to its detriment. *Varela v. Ashcroft*, 368 F.3d 864, 866 (8th Cir.2004); *Rutten v. United States*, 299 F.3d 993, 995 (8th Cir.2002).

▆▆▆ MSB does not assert BLMI made a false misrepresentation, but instead argues BLMI and the Schooley Defendants failed to file any financing statements for the 1999 and 2000 cattle, claiming that if they had done so, MSB would have been put on notice of their claims prior to making the loan for the 2000 cattle. MSB asserts that by failing to file financing statements or post notice of ownership, BLMI allowed the Weilers to lead third parties to believe the Weil-

---

17. In support of its estoppel argument, MSB relies heavily on *American Bank & Trust v. Shaull*, 678 N.W.2d 779, 790 (S.D.2004), a case from the Supreme Court of South Dakota addressing estoppel by negligence. MSB asserts that the Bankruptcy Court sidestepped applying the reasoning of *Shaull* by incorrectly finding that there had been no communication between BLMI and MSB. In footnote 3 of the November 4, 2004, order, the Bankruptcy Court explained why *Shaull* did not control its decision, stating MSB did not specifically identify its argument as estoppel by negligence or identify any Eighth Circuit or Iowa state law authority for the estoppel by negligence premise. The Bankruptcy Court stated that based on the lack of argument from MSB and corroborating authorities in the Eighth Circuit or by Iowa courts, the Bankruptcy Court would discuss the estoppel issue based upon well-settled analysis.

ers owned the cattle. "Silence ... generally is not affirmative conduct that gives rise to a finding of equitable estoppel." *Garfield v. J.C. Nichols Real Estate,* 57 F.3d 662, 666 (8th Cir.1995). However, silence may be the basis of an estoppel claim where there is a duty to speak. *Int'l Harvester Credit Corp. v. Leaders,* 818 F.2d 655, 659 (8th Cir.1987). MSB has failed to show that during the relevant time period, BLMI, as owner of the cattle, was under a duty to file a financing statement for the 1999 or 2000 cattle. Indeed, the Bankruptcy Court concluded the statutes in place at the time the cattle bailment took place did not require the filing of a UCC statement. In addition, Willrett testified at trial that based on his education and experience, the filing of UCC financing statements is a practice he has not seen occur in the industry or in any of his experiences with custom feeding. Under no duty to speak, BLMI's silence does not give rise to an equitable estoppel claim. The Bankruptcy Court concluded that to the extent MSB was the victim of a misrepresentation, David Weiler made the misrepresentation by stating that he owned the cattle in his feedlot, and based upon a review of the record, this Court agrees.

The Bankruptcy Court further found that MSB possessed the ability to obtain the true facts. Indeed, MSB has failed to establish that it was unable to investigate the Weilers' feedlot operation or reputation. Given its knowledge that the Weilers had custom fed cattle in the past, it is inexplicable why no real investigation was undertaken to develop a better understanding of the Weilers' operation. This Court finds no error in the Bankruptcy Court conclusion an estoppel claim by MSB would fail on its merits.

**5. Did the Bankruptcy Court err in concluding that the Cattle were not held for sale?**

MSB argued that even if the Weilers did not have sufficient rights in the cattle for its security interest to attach pursuant to Iowa Code § 544.9203(1), its interest would attach because the delivery of the cattle should be deemed a sale to the Weilers under Iowa Code § 554.2326(3). MSB contends the Bankruptcy Court misinterpreted the provision governing whether the delivery of the cattle to the Weilers was a deemed sale or return under Iowa Code § 554.2326(3). BLMI asserts MSB has not produced any evidence showing BLMI delivered the cattle to the Weilers for sale, which is an essential element for the attachment of a security interest under § 554.2326(3). BLMI states the 2000 cattle were delivered to the Weilers for feeding, after which BLMI, and not the Weilers, would sell the cattle. CFB similarly asserts the Bankruptcy Court's finding that the cattle were not held for sale is well grounded in the trial record, citing to the trial testimony of Ron Schooley and Jim Beattie, a buyer for IBP, who both offered credible reasons regarding why Weiler's name appeared on IBP checks for the sale of BLMI cattle.

Iowa Code § 554.2326(3), as in effect at the time of the transactions at issue, read as follows:

Where goods are delivered to a person for sale and such person maintains a place of business at which that person deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making

delivery until payment or resale or uses such words as "on consignment" or "on memorandum".

Iowa Code § 554.2326(3) (2000). The Bankruptcy Court found that Iowa Code § 554.2326(3) was inapplicable to the proceedings, finding the cattle were delivered to the Weilers subject to a mutually beneficial bailment, and thus the cattle were not delivered for sale.

A bailment occurs when personal property has been delivered by one person, the bailor, to another, the bailee, for a specific purpose beneficial to the bailee or the bailor, or both, with the understanding the property will be returned to the bailor after the purpose has been accomplished. *Farmers Butter & Dairy Coop. v. Farm Bureau Mut. Ins. Co.*, 196 N.W.2d 533, 538 (Iowa 1972). Generally, a bailment is based on an expressed or implied agreement. *Id.* However, it can also arise by operation of law when justice requires. *See* 8A Am.Jur.2d Bailments § 8 (1997). Thus, when a person comes into lawful possession of personal property of another without an underlying agreement, the possessor may become a constructive bailee. *Id.* Once a bailment is established, the law imposes specific duties upon bailees to care for the bailor's property while it is in their possession. The degree of care required to be exercised by a bailee depends upon the type of bailment.

*Khan v. Heritage Property Mgmt.*, 584 N.W.2d 725, 729–730 (Iowa Ct.App.1998). Here, BLMI delivered the cattle to the Weilers for the specific purpose of fattening the cattle. The record supports the Bankruptcy Court's conclusion that this purpose was beneficial to both BLMI and the Weilers; BLMI was able to dispose of its cattle without taking a loss in the process, and the Weilers received compensa-

tion from BLMI when the cattle were sold. BLMI and the Weilers had the understanding that once the cattle were fattened, they would be returned to BLMI, who made the ultimate decision regarding when the cattle were to be returned and sold for slaughter. Given the facts of this case and the nature of the agreement between BLMI and the Weilers, the Court concludes the Bankruptcy Court committed no error in finding the Weilers held the 1999 and 2000 cattle subject to a bailment, and therefore delivery of the 1999 and 2000 cattle to Debtors' feedlot should not be deemed a sale or consignment.

■■■ A security interest of a bailee's creditor does not attach to goods that are the subject of a bailment. *Rohweder v. Aberdeen Prod. Credit Ass'n*, 765 F.2d 109, 112 (8th Cir.1985) ("mere possession of the collateral ... does not give the debtor sufficient rights for a security interest to attach."). Because the 1999 and 2000 cattle were subject to a bailment, MSB's security interest did not attach to the cattle.

6. **Did the Bankruptcy Court err in concluding that the exception of Section 554.2326(3)(b) was applicable because MidWestOne Bank had knowledge that Weilers were custom feeding?**

■■■ The Bankruptcy Court concluded that even if Iowa Code § 554.2326 was applicable, MSB knew the Debtors were engaged in the business of custom feeding cattle at their farm, and thus BLMI had demonstrated a valid defense under Iowa Code § 554.2326(3)(b). MSB argues that there is no evidence in the record that MSB had actual knowledge that the cattle belonged to BLMI, or that the Weilers were custom feeding cattle. MSB contends the fact that it knew the Weilers had custom fed cattle prior to MSB financing the Weilers is not relevant to whether the

defense of Iowa Code § 554.2326(3)(b) is available.

BLMI and CFB assert the Bankruptcy Court was correct in determining that even if MSB had established the elements of Iowa Code § 554.2326(3), the exception stated § 554.2326(3)(b) was applicable. BLMI and CFB assert it was generally known by MSB that the Weilers were in the business of custom feeding, and that the Weilers had custom fed cattle for BLMI.

Iowa Code § 554.2326(3)(b) states in relevant part,

> [T]his subsection is not applicable if the person making delivery a. complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or b. establishes that the person conducting the business is generally known by creditors of the person conducting the business to be substantially engaged in selling the goods of others, or c. complies with the filing provisions of the Article on Secured Transactions (Article 9).

Iowa Code § 554.2326(3) (2000). There is no dispute that no sign was placed on the Weilers' feedlot indicating that the 1999 or 2000 cattle belonged to BLMI, and there is no dispute that neither BLMI nor the Schooley Defendants made any UCC filings.[18]

The issue of whether MSB had knowledge that the Weilers were custom feeding has previously been addressed in section III.A.2.(c) of this order. Given the conclusion contained in that discussion, the Court concludes that even if the cattle were delivered for sale pursuant to Iowa Code § 554.2326(3), the Bankruptcy Court could conclude the defense contained in Iowa

Code § 554.2326(3)(b) is applicable and MSB's security interest would not attach.

**B. 4:04–cv–00673. _Official Unsecured Creditors Committee v. Weiler, et al._**

The Official Unsecured Creditors Committee ("OUCC") incorporates the arguments made in the 4:04–cv–00672 appeal and makes the following additional arguments:

**1. Did the Bankruptcy Court err in failing to consider the OUCC's contention that the setoff by Defendant BLMI of $335,661.86 was an avoidable preferential transfer?**

OUCC contends that during the preference period, BLMI offset amounts it owed to Weiler against amounts it was owed for antecedent debt. OUCC states that BLMI was owed $201,500.00 for advances it made to the Weilers and that BLMI also carried antecedent debt onto the 2000 ledger in the amount of $134,161.86. OUCC concludes that BLMI therefore offset, pre-petition, $335,661.86 to satisfy antecedent debt owed to it by the Weilers on the 2000 cattle ledger. OUCC contends that to the extent this offset occurred pre-petition, it is a preferential transfer and thus recoverable under Section 547(b) of the Bankruptcy Code. OUCC further argues that to the extent the offset was accomplished post-petition, it is an unauthorized post-petition transfer avoidable under Section 549(a) of the Bankruptcy Code.

CFB argues that in order to prevail on a preference claim under either 11 U.S.C. § 547(b) or 11 U.S.C. § 549(a), the OUCC would need to prove that there was a transfer of property of the Weilers' estate.

---

**18.** In 1990, CFB did file UCC-1s for the cattle it financed for BLMI. (_See_ Trial Exhibit Binder II, exhibits 1619–1625.)

CFB asserts that BLMI's purported exercise of setoff rights through the sale of its own cattle should therefore fail as a matter of law, as the cattle at issue here were owned by BLMI, not the Weilers. BLMI contends that there was no transfer of property of the Weilers that could conceivably give rise to § 547 and § 549 preferential transfer claims, because the Weilers did not own the cattle. BLMI further asserts that the OUCC's amended complaint did not include a § 553 setoff claim or any other type of setoff claim, and that even if it had, such a claim would be without merit. BLMI argues OUCC is incorrect in claiming the Weilers owed BLMI the $335,661.68 the OUCC claims BLMI offset because this money constituted advances, paid by BLMI to the Weilers, on the amount BLMI would have owed the Weilers under the custom feeding contract after the sale of the 1999 and 2000 cattle.

Pursuant to the terms of the custom feeding agreement, the only interest the Weilers would have had in the 2000 cattle would have been the amount BLMI received from the sale of the 2000 cattle that was in excess of BLMI's costs for the cattle. The record shows that at the end of 2000, the Weilers had been advanced amounts in excess of the proceeds they would have received under the custom feeding agreement, and therefore they were carrying forward debt. Because of this debt, unless BLMI's excess profit for the 2000 cattle exceeded the total amount of debt owed, the Weilers would receive nothing upon the sale of the cattle, *having already been paid, i.e., advanced, their interest.* The OUCC has failed to provide any citation to facts in the record which demonstrate that when the 2000 cattle were sold, the excess profits exceeded the

amount of the advances the Weilers had received from BLMI. As BLMI correctly points out, BLMI cannot be held to owe the Weilers money it had already paid to them in the form of an advance.

The Bankruptcy Court did not fail to consider the OUCC's setoff contention. The Bankruptcy Court simply summarily indicated that it had considered "all the other arguments presented by the OUCC and MSB, and finds them to be without merit." (November 4, 2004, Order, p. 28.) Thus, while a detailed explanation of the Bankruptcy Court's analysis on this issue was not included in the November 4, 2004, order, the issue was considered and dismissed. A review of the merits of the claim finds any such setoff claim must fail, and the dismissal was appropriate.

2. **Did the Bankruptcy Court err in failing to consider the OUCC's contention that BLMI received an avoidable post-petition transfer of Debtors' property by causing Debtors' corn and silage to be fed to the cattle post-petition?**

OUCC argues the November 4, 2004, order of the Bankruptcy Court incorrectly concluded the OUCC had filed an amended complaint which essentially eliminated a claim for post-petition feed supplied to the remaining 2000 cattle. The OUCC quantifies its claim for recovery of the corn and silage fed to the remaining 2000 cattle as $34,214.12.[19] The OUCC contends the Bankruptcy Court erred in failing to amend its order to address this cause of action and make the findings necessary to its adjudication.

CFB argues the claim was properly rejected by the Bankruptcy Court and affir-

---

19. The OUCC asserts that the amount of post-petition preference received by BLMI and CFB on account of feed fed post-petition to

the 2000 cattle is calculated as 24,883 times $1.375, or $34,214.12.

mance is appropriate. In addition, CFB argues that the statutory basis for the OUCC's claim is flawed because this is a chapter 11 reorganization case, thus as debtors-in-possession, the Weilers were authorized to use the property of their estate in the ordinary course of business without notice or a hearing. BLMI asserts that amended complaint makes no mention of the corn and silage, and that even if the OUCC had actually asserted a preferential transfer claim for the corn and silage, such a claim would have been without merit.

On March 14, 2002, David and Edna Weiler filed a complaint, initiating adversary proceeding 02–20045. In this complaint, the Weilers alleged counts of conversion/turnover (count one), section 549 preference (count two), and section 547 preference (count three). Count one specifically addressed silage and corn the Weilers fed to the 2000 cattle post-petition, for which the Weilers claimed they expected to be paid. The Weilers claimed BLMI never paid them for the silage and corn fed to the 2000 cattle, but instead offset any amount BLMI owed to them against debt the Weilers owed to BLMI. The Weilers asserted that they were damaged as a proximate result of the conversion of the silage and corn that was fed to the cattle post-petition in the amount of the fair market value of the corn and silage.

The amended complaint alleged four counts: avoidance of liens (count one), section 547 preference (count two), section 549 preference (count three), and an automatic stay violation (count four). Count one specifically asserted that the Weilers were the owners of the cattle, and sought to avoid any interest CFB or BLMI had in the cattle. Count two claimed that the transfers by the Weilers of the 2000 cattle were an avoidable transfer. Count three asserted the same facts as count two, but

proceeded under § 549 as opposed to § 547. Finally, count four alleged that the post-petition transfer of the cattle to the Schooleys was in violation of the automatic stay of § 362(a) of the Bankruptcy Code.

The amended complaint did not assert a specific count of conversion/transfer as was alleged in count one of the original complaint. The OUCC contends that paragraphs 30 and 31 of the amended complaint alleged wrongful post-petition transfer of the corn and silage to BLMI, count three sought recovery of the transfer as a § 549 preference, and count four sought recovery as being violative of the automatic stay of the bankruptcy.

■■■ "The function of an affirmative federal pleading, under Fed.R.Civ.P. 8(a)(2), is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 714 (8th Cir.1979).

> "(T)he federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, * * *" provided that such a shift in the thrust of the case does not work to the prejudice of the opposing party.

*Oglala Sioux*, 603 F.2d at 714 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1219 at 145 (1969)) (quotations omitted). Technically, the Bankruptcy Court was correct in finding a such a claim had been eliminated from the numbered counts contained in the amended complaint. However, the original complaint contained a count for the alleged conversion/transfer of the corn and silage, and the factual allegations contained in the amended complaint placed BLMI and CFB on notice that the post-petition trans-

fer of the corn and silage were facts underlying the counts presented in the amended complaint. No party would have been prejudiced had the Bankruptcy Court considered the issue MSB raised in its post-trial brief regarding the transfer of the corn and silage. In any event, a claim by MSB for the alleged conversion/transfer of the corn and silage fails on the merits.

First, under the terms of the custom feeding agreement, the Weilers, and not the Schooleys, were responsible for the costs incurred in caring for and feeding the cattle placed on their lot. Second, the Weilers' bankruptcy proceeding was a chapter 11 reorganization case.

> Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, *a debtor in possession shall have all the rights,* other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, *of a trustee serving in a case under this chapter.*

11 U.S.C. § 1107(a) (emphasis added). "Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, *the trustee may operate the debtor's business.*" 11 U.S.C. § 1108 (emphasis added).

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, *the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.*

11 U.S.C. § 363(c)(1) (emphasis added).

 Finally, even if the court were to conclude that the corn and silage constituted a preferential transfer of Weiler estate property, BLMI and CFB have established the "ordinary course of business" defense to the preferential transfer claim. The "ordinary course of business" exception contained in 11 U.S.C. § 547(c)(2) states that a trustee may not render void a transfer that (1) is in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (2) is made in the ordinary course of business or financial affairs of the debtor and the transferee; and (3) is made according to ordinary business terms. 11 U.S.C. § 547(c)(2). Here, CFB and BLMI have established by a preponderance of the evidence that these three elements exist. First, the "transfer" of the corn and silage was part of the custom feeding agreement, thus, to that end, the feeding of the cattle was a "debt" incurred by BLMI during the ordinary course of business between the Weilers and BLMI. Second, this "transfer" was made in the ordinary course of business between the Weilers and BLMI and was made according to business terms; the feeding and caring for the cattle was the basis of the agreement, and there is no evidence to show that the feeding of the corn and silage in any way deviated from the regular course of business in which BLMI and the Weilers engaged.

 OUCC argues that because Willrett testified the Weiler/BLMI agreement was atypical, the transfer was outside the scope of § 547(c)(2). The purpose behind § 547(c)(2) was to leave undisturbed normal financial relations, because they do not detract from the general policy of discouraging unusual action by either the debtor

or their creditors "during the debtor's slide into bankruptcy." *In re Spirit Holding Co., Inc.,* 153 F.3d 902, 904 (8th Cir. 1998) (quoting S.Rep. No. 95–989 at 88 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874). Here, while the custom feeding agreement between the Weilers and BLMI may have been atypical for the industry, it was not atypical given the business terms the Weilers and BLMI normally operated under. In feeding the corn and silage to the cattle, the Weilers were acting as they always had in the ordinary course of their business relationship with BLMI, and such action cannot be deemed unusual.

The Court has considered the OUCC's claim of conversion/transfer and concludes that any such claim would fail on its merits, as any transfer of corn and silage occurred in the ordinary course of business conducted during a chapter 11 bankruptcy proceeding.

## IV. CONCLUSION

The Court concludes the Bankruptcy Court erred in refusing the consider the merits of the motion to amend. In the interest of judicial efficiency, and because the record is fully adequate for this Court to address the merits of the motion to amend, the Court declines to remand these proceedings to the Bankruptcy Court for further consideration.

The Court has considered both the motion to amend and the merits of the issues presented on appeal and concludes as follows:

After a thorough review of the record of this case, including the trial testimony and exhibits in evidence, none of the findings of fact made by the Bankruptcy Court are clearly erroneous. The Court further concludes no further factual findings should be made that would affect the outcome of this case. The findings made by the Bank-

ruptcy Court provide a clear understanding of the basis of that court's decision and the grounds upon which that decision was reached.

The Bankruptcy Court did not err in concluding that BLMI and CFB were not estopped from denying the Weilers had rights in the cattle.

The Bankruptcy Court did not err in concluding that the cattle were not held for sale.

The Bankruptcy Court did not err in concluding the exception of Section 554.2326(3) was applicable.

The November 4, 2004, order of the Bankruptcy Court is affirmed in its entirety.

**IT IS SO ORDERED.**